## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **2:15-cr-00037-CDJ** |
| | : | |
| **JEFFREY BADO** | : | |

## DEFENDANT'S MOTION IN LIMINE TO PRECLUDE STEPHEN M. THOMAS, M.D., FROM PROVIDING CERTAIN OPINION TESTIMONY AT TRIAL

Pursuant to Federal Rules of Evidence 402, 403, 404, and 702, and for the reasons discussed in the Brief that follows, the defendant, Jeffrey Bado, D.O. ("Bado" or "Dr. Bado") asks the Court to enter an Order in the form attached, precluding the Government's pain management practice expert, Stephen M. Thomas, M.D., from providing opinions at trial that are based upon the inadmissible portions of Dr. Thomas' report. In the portions at issue, Dr. Thomas: (A) applies inflammatory and/or irrelevant terms, including "unfathomable," "egregious," "horrifying," "shocking," "astonishing," "grossly negligent on its face," "pill mill," "the Bado Organization" and "ethically unfit for the practice of the profession" to refer to Dr. Bado and his prescribing of controlled substances; (B) discusses Dr. Bado's extramarital affairs with patients; (C) offers wide ranging opinions without any specific connection to a named patient; and (D) discusses numerous patient files not charged by the Government (including a death case), in the process raising the fundamental error of a constructive amendment to the Superseding Indictment.

The Court should grant Dr. Bado's Motion, because each category of anticipated expert testimony from Dr. Thomas is irrelevant to the elements of the crimes with which Dr. Bado has been charged, would be more unfairly prejudicial to Dr. Bado than probative of the Government's case in chief. The identified portions of Dr. Thomas' report also violate the "fit"

requirement imposed on expert testimony in this circuit by the <u>Daubert</u> and <u>Paoli II</u> decisions, and would force Dr. Bado to defend against a multitude of new prescribing claims that are not contained within the Superseding Indictment filed on June 10, 2015.

LAW OFFICES OF RICHARD MAURER, INC.

Richard H. Maurer RM4782
211 N. 13th Street, Suite 801
Philadelphia, PA 19107
(215) 755-9000
(215) 755-9100 fax

September 4, 2015

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **2:15-cr-00037-CDJ** |
| | : | |
| **JEFFREY BADO** | : | |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE STEPHEN M. THOMAS, M.D., FROM PROVIDING CERTAIN OPINION TESTIMONY AT TRIAL**

**I.       BACKGROUND**

The core of the Government's case against Dr. Bado is that he prescribed Oxycodone and Methadone for patients in his chronic pain management practice, "outside the usual course of professional practice and not for a legitimate medical purpose." See Superseding Indictment at 14-15.  Based on this assertion, the Government claims at Count III of the Superseding Indictment that Dr. Bado was solely responsible for the death of a former patient, Joseph Armstrong, who had four packets of cocaine in his hand (and many other controlled substances in his system) when he was found nonresponsive in his child's bedroom on February 17, 2011, more than three weeks after Dr. Bado discharged Mr. Armstrong from his medical practice.

On August 26, 2015, the Government served the expert report of Stephen M. Thomas, M.D., a Diplomate of the American Board of Pain Medicine.  See Exhibit A (Government cover letter, Aug. 26, 2015); Exhibit B (Thomas Report, Aug. 5, 2015).  While defendant understands that the Government hired Dr. Thomas to criticize Dr. Bado's prescribing of controlled substances, the Thomas Report frequently crosses the line that separates reasoned medical opinion from ad hominem and otherwise prejudicial attacks on Dr. Bado, his ethics, and his personal life.  In the process, Dr. Thomas devotes eight pages of his report to general opinions about unidentified patients, not identifying any specific patient at issue in a discussion until page

11 of the report.  While Dr. Thomas is not a statistician, he conducted an ad hoc "Random Sampling" of Dr. Bado's patient files, and then discusses a multitude of "randomly sampled" files that are not described or otherwise mentioned in the already lengthy Superseding Indictment.

In summary, the Thomas Report is a compelling example of over-reaching.  Not content with reasoned medical criticisms of Dr. Bado's prescribing, Dr. Thomas goes after Dr. Bado's personality and ethics.  Not content with the 89 patient files already pleaded in the Superseding Indictment, Dr. Thomas would have Dr. Bado defend against alleged prescribing irregularities contained in a host of new patient files, while further prolonging trial.  The remedy is an Order that restricts Dr. Thomas to what Rule 702, Daubert, and Paoli II allow him to do: provide reasoned medical opinions on specific patient files, illustrated with specific examples of what Dr. Thomas may characterize as improper prescribing.[1]  The objectionable portions of the Thomas Report comprise the following categories:

## A.    Inflammatory and/or irrelevant terms

After invoking Dr. Bado's "responsibility to the people of the Commonwealth of Pennsylvania and the United States of America" to write medically reasonable prescriptions (physicians are not nationally licensed in the US), Dr. Thomas articulates a theory that "the lack of medical legitimacy for the first prescription implies the lack of medical legitimacy for all subsequent prescriptions." See Exhibit B at 5.  Dr. Thomas does not identify any medical support for this variant of the "false in one, false in all" jury instruction, but uses it to say: "This is one of the more frequent egregious prescribing deficiencies displayed in Dr. Bado's handling of

---

[1] Defendant does not challenge Dr. Thomas' qualifications for purpose of this motion, but no part of his education, training or experience allow Dr. Thomas to express "horror" at Dr. Bado's actions, testify on the connection between extramarital affairs and medical prescribing, or otherwise provide expert opinions that exceed the boundaries provided by the applicable Rules of Evidence.

patients." Id.  Dr. Thomas' tone grows more negative at the bottom of page 5, when he states (with reference to unidentified, "too high a dose" prescriptions) that "to do so for two different controlled substances at the same time is unfathomable." Id.  Referring on the next page to Dr. Bado's simultaneous prescribing of Oxycodone and Methadone, Dr. Thomas opines: "The cavalier manner in which Dr. Bado provided these prescriptions to this group of high-risk patients [Dr. Thomas does not say who they were] was horrifying." "The displayed combination of ignorance and hubris was shocking." Id. at 6.  After suggesting at the top of page 7 that a chronic pain patient who tests positive for Marijuana thereby disqualifies herself from any further pain relief medication, Dr. Thomas states at the bottom of page 7 that "the sale of controlled substance prescriptions is not consistent with the legitimate practice of medicine. It is usually known as "drug dealing."" Id. at 7.  On the next page of his report, Dr. Thomas refers to Dr. Bado's pain management practice as "the Bado organization."  The invited comparison to the "Gambino Organization" or other organized crime syndicates, especially to an urban jury, is obvious.

Dr. Thomas provides more emotional criticisms of  Dr. Bado at the bottom of page 9, stating that the presence of a committee to assess discharged patients for readmission to the practice was "astonishing," and that Dr. Bado's use of the readmission committee was "the height of irresponsibility." Id. at 9.  At the bottom of page 10, Dr. Thomas states that Dr. Bado's "actions were incomprehensible in their inconsistency with accepted treatment principles of any responsible segment of the medical community," states that he was "ethically unfit for the practice of the profession," and then refers to Dr. Bado's practice as a "pill-mill." Id.  at 10. Absent a pretrial ruling on the extent to which Dr. Thomas can convey his "shock" and "horror" about the "unfathomable" prescribing practices of the "pill mill" known as "the Bado

3

organization," which was masterminded by the "ethically unfit" Dr. Bado, defense counsel will be forced to object to virtually every opinion and supporting fact provided by Dr. Thomas at trial.  And it is well known that jurors do not like objections.

### B.    Testimony about Extramarital Affairs

At the top of page 10, Dr. Thomas provides a wide-ranging discussion of Dr. Bado's marital infidelity, with reference to state standards of practice for osteopathic medicine that characterize sexual relations with a patient as "unprofessional conduct."  See id. at 10. Combining critiques of extramarital affairs with prescribing practice, Dr. Thomas then opines that "no prescription for a controlled substance written after the introduction of sexual liaison, particularly sexual liaison directly connected with the physician's willingness to write the prescription, could be considered as having been prescribed for a legitimate medical purpose." Id.  Although the Thomas Report is replete with other circumstances that, according to Dr. Thomas, show prescriptions written without a legitimate medical purpose, his reference to extramarital affairs provides the Government with an argument to admit evidence of extramarital affairs that is otherwise the definition of highly prejudicial evidence under Fed. R.E. 403.

### C.    Wide-ranging opinions without any specific connection to a named patient

Dr. Thomas lists the 89 patient files, by name, at the start of his report.  See id. at 2-3. That is the last the reader hears of any specific patient until page 11, when Dr. Thomas finally groups patients under alleged deficiencies with Dr. Bado's prescribing.  See id. at 11.  In between, Dr. Thomas offers a multitude of opinions, but none of them have the support of an identified patient file.  See id. at 5 ("the drug doses were so high that they represented an immediate danger to the patient's health"); ("In these instances, the well-being and care of patients cannot have been Dr. Bado's aim or motivation"); ("In my opinion, writing multiple

4

prescriptions for one drug in too high a dose to be reasonable or necessary for the treatment of any chronic non-malignant pain is unwarranted."); 6 ("The cavalier manner in which Dr. Bado provided these prescriptions to this group of high-risk patients was shocking."); 7 ("Dr. Bado, fully aware of the evidence of elevated risk, routinely prescribed inappropriately high doses of opioid to such patients, continuously ignoring the repeated evidence of underlying substance abuse disorder."); ("To knowingly contribute to the burgeoning black market in prescription drugs is outside the scope of a physician's usual professional practice."); 8 ("In Dr. Bado's patient population, negative urine drug screens were frequently found, and repeatedly ignored."); ("There are clear instances where [Dr. Longo's] prescribing behavior would independently be deemed to be inconsistent with the accepted treatment principles in any responsible segment of the medical community."); 9 ("The medical records show that Mr. Thomas would with an untrained eye observe the patients, perform vital signs, and hand them prescriptions for money."); 10 (alleging Dr. Bado's "inability to face patients with drug problems and tell them the medical truth about their medical condition.").

The first question that arises in response to each of the above allegations is "what patient file is he talking about?"  The next questions are "what visit?" and "what prescription?" and "when was it filled?"  Dr. Thomas provides none of this necessary supporting detail in the first ten pages of his report.  The results are countless "net opinions," delivered in authoritative terms, but without any identified factual support.

**D.     Numerous patient files not mentioned in the Superseding Indictment, including a death case.**

Although Dr. Thomas is not a statistician, the final section of his report is devoted to discussing additional patient files, that he identified through a random sampling, reportedly for the sake of "absolute completeness."  See id. at 12.  After conducting "as random a sampling as I

5

could muster," Dr. Thomas criticizes the prescribing evidence contained in a series of patient

files that are not mentioned in the Superseding Indictment.  See id. at 13-15.  Notably, the

specificity of Dr. Thomas' critique of each patient file far exceeds the detail he has provided for

any indicted patient file.  Dr. Thomas ends his report with the most prejudicial content he could

muster – an extended discussion of the case of Marvin Epstein, a patient of Dr. Bado's who was

found non-responsive on December 18, 2009, and subsequently died on this 50th birthday.  See

id. at 16.  While much of Dr. Thomas' discussion of the Epstein case ventures into speculation

(see bottom of page 16: "Any additional even minor stress, such as a pillow over his airway or a

face down sleeping position could have exacerbated the condition"), Dr. Thomas evidently

places the blame for Epstein's death on Dr. Bado.  See id. ("The combined toxicity of the drugs

could account for the patient's demise in a manner described as an 'adverse drug reaction.'").

Dr. Bado was not indicted for the death of Marvin Epstein, but Dr. Thomas' report puts him on

trial for it all the same.

II.     ARGUMENT

    A.     Dr. Thomas applies inflammatory and/or irrelevant terms to refer to Dr.
           Bado and his prescribing of controlled substances.

    "Obviously, inflammatory rhetoric and highly conclusory statements, which appear

throughout these reports, are never appropriate expert testimony."  Zenith Radio Corp. v.

Matsushita Elect. Indust. Co., Ltd., 505 F. Supp. 1313 (E.D. Pa. 1980), reversed in part, 723 F.2d

238 (3d Cir. 1983), vacated and reversed, 106 S. Ct. 1348 (1986).  It is not often that one finds an

expert report laden with personal attacks and inflammatory characterizations.  However, this

Court's observations, made decades ago in the Zenith Radio case, apply with equal force to the

Thomas Report.

    After invoking what sounds like a patriotic "responsibility to the people of the

Commonwealth of Pennsylvania and the United States of America" to write medically

reasonable prescriptions, Dr. Thomas articulates a theory that "the lack of medical legitimacy for

the first prescription implies the lack of medical legitimacy for all subsequent prescriptions." <u>See</u>

Exhibit B at 5.  Dr. Thomas does not identify any medical support for this variant of the "false in

one, false in all" jury instruction, but uses it to say: "This is one of the more frequent egregious

prescribing deficiencies displayed in Dr. Bado's handling of patients."  <u>Id</u>.  Dr. Thomas' tone

grows more negative at the bottom of page 5, when he states (with reference to unidentified, "too

high a dose" prescriptions) that "to do so for two different controlled substances at the same time

is unfathomable."  <u>Id</u>.

Referring on the next page to Dr. Bado's simultaneous prescribing of Oxycodone and

Methadone, Dr. Thomas opines: "The cavalier manner in which Dr. Bado provided these

prescriptions to this group of high-risk patients [Dr. Thomas does not say who they were] was

horrifying." "The displayed combination of ignorance and hubris was shocking."  <u>Id</u>. at 6.  After

suggesting at the top of page 7 that a chronic pain patient who tests positive for Marijuana

thereby disqualifies herself from any further pain relief medication, Dr. Thomas states at the

bottom of page 7 that "The sale of  controlled substance prescriptions is not consistent with the

legitimate practice of medicine. It is usually known as "drug dealing.'"  <u>Id</u>. at 7.  On the next

page of his report, Dr. Thomas refers to Dr. Bado's pain management practice as "the Bado

organization."  The invited comparison to the "Gambino Organization" or other organized crime

syndicates, especially to an urban jury, is obvious.

Dr. Thomas provides more emotional criticisms of  Dr. Bado at the bottom of page 9,

stating that the presence of a committee to assess discharged patients for readmission to the

practice was "astonishing," and that Dr. Bado's use of the readmission committee was "the

7

height of irresponsibility." Id. at 9.  At the bottom of page 10, Dr. Thomas states that Dr. Bado's "actions were incomprehensible in their inconsistency with accepted treatment principles of any responsible segment of the medical community," states that he was "ethically unfit for the practice of the profession," and then refers to Dr. Bado's practice, Daily News-style, as a "pill-mill." Id. at 10.

District courts have broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403.  See Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110 (3d Cir.1999); Andrade v. Walgreens-Optioncare, Inc., 784 F. Supp. 2d 533, 535 (E.D. Pa. 2011) ("Because the risk of unfair prejudice here substantially outweighs any probative value that status might have, I will grant Andrade's Motion to preclude Walgreens from presenting evidence relating to Andrade's immigration status under Rule 403.").  "The Advisory Committee Notes define 'unfair prejudice' to mean 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  DiSalvio v. Lower Merion High School District, 00-civ-5463, 2002 WL 660193, * 2 (E.D. Pa., April 22, 2002).

The Third Circuit has explained that evidence subject to scrutiny under Rule 403 is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established propositions in the case."  DiSalvio at * 2, quoting Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir.1980).  Here, not only does Dr. Thomas appeal to the jury's sense of horror, he actually uses the term "horrified" in his report.  See Exhibit B at 6.  Courts should also consider the probable effectiveness or lack of effectiveness of a limiting instruction and the availability of other means of proof.  Id., citing Advisory Committee Notes to Rule 403.  The Court explained its preclusion under Rule 403 in DiSalvio as follows:

8

Here, the Court is satisfied that the reference of Russell as "Chester the Molester" will result in substantial unfair prejudice to the Defendants. The word "Molester" suggests an individual of sexual perversity and deviance, particularly of an individual who engages in indecent behavior towards young children, which is particularly abhorrent. Considering the feelings of disgust and outrage this word is likely to cause, a curative instruction to the jury is unlikely to be effective. Once the jury hears this phrase in connection with Russell, regardless of the purpose for which it is offered, Russell and the School Defendants will be unfairly prejudiced. Exclusion of this evidence will not unfairly disadvantage the Plaintiff, who has presented enough evidence by other means to support her claims and has other ways of impeaching defense witnesses and bolstering the credibility of her own witnesses. Accordingly, Plaintiff is precluded from introducing the term "Chester the Molester" at trial.

Allowing Dr. Thomas to convey to the jury his "shock" and "horror" about the "unfathomable" prescribing practices of the "pill mill" known as "the Bado organization," which was masterminded by the "ethically unfit" Dr. Bado, without any apparent probative value to the Government's case, will violate the balancing test provided by Fed. R.E. 403. The Court should preclude Dr. Thomas from engaging in invective, and instead require him to provide reasoned medical opinions consistent with Fed. R.E. 702.

**B.    Dr. Thomas' discussion of Dr. Bado's extramarital affairs with patients violates Rules 403 and 404, without a corresponding need in the Government's case in chief.**

Extramarital cheating is a prior bad act, even when presented to the jury within a framework of expert medical testimony.  As such, it is governed by Federal Rule of Evidence 404 (b), which provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R.E. 404(b)(1). The rule states, however, that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R.E.

404(b)(2).

The Third Circuit has repeatedly explained that Rule 404(b) is generally a rule of exclusion. See United States v. Caldwell, 760 F.3d 267, 275, 2014 WL 3674684, at *5 (3d Cir. July 24, 2014).  It "directs that evidence of prior bad acts be excluded—unless the proponent can demonstrate that the evidence is admissible for a non propensity purpose." Id. The Third Circuit has "repeatedly and consistently emphasized that the party seeking to admit evidence under Rule 404(b)(2) bears the burden of demonstrating its applicability." United States v. Brown, 765 F.3d 278, 291 (3d Cir. 2014).

There are four distinct steps that must be satisfied before prior bad act evidence may be introduced at trial: (1) it must be offered for a proper non-propensity purpose that is at issue in the case; (2) it must be relevant to that purpose; (3) its probative value must not be outweighed by the danger of unfair prejudice under Rule 403; and (4) it must be accompanied by a limiting instruction, if one is requested. See Brown at 291, citing Caldwell, 760 F.3d at 277, 2014 WL 3674684, at *7.  This methodical process requires "careful precision" by both the proponent in proffering the prior act evidence and by the trial judge who must decide the question of admissibility. Caldwell at 274, 2014 WL 3674684 at *4.  Significantly, "[w]hen confronted with a proffer under Rule 404(b), a district court should not merely inquire of the prosecution what it wishes the evidence to prove. Rather, the court should also require the prosecution 'to explain exactly how the proffered evidence should work in the mind of a juror to establish the fact the government claims to be trying to prove.'" Brown at 294, quoting Caldwell, 760 F.3d at 282, 2014 WL 3674684, at *12.

Starting at page ten of his report, Dr. Thomas provides a wide-ranging discussion of Dr. Bado's marital infidelity.  Dr. Thomas notes that "Dr. Bado admitted that he made house calls

10

for some of his female patients of child-bearing age," <u>see</u> Exhibit B at 10, and quotes at length from state standards of practice for osteopathic medicine that characterize sexual relations with a patient as "unprofessional conduct."  <u>See id</u>. at 10.[2]  Combining critiques of extramarital affairs with prescribing practice, Dr. Thomas then opines that "no prescription for a controlled substance written after the introduction of sexual liaison, particularly sexual liaison directly connected with the physician's willingness to write the prescription, could be considered as having been prescribed for a legitimate medical purpose."  <u>Id</u>.

Against the rigorous framework for admission of Rule 404 (b) evidence provided by <u>Caldwell</u> and <u>Brown</u>, evidence of Dr. Bado's extramarital affairs fails to qualify, even if provided by an expert witness.  According to other portions of Dr. Thomas' report, every indicted prescription had an issue (without need for evidence of marital infidelity) that made it "inconsistent with a medically legitimate purpose."  <u>See</u> Exhibit B at 11-12.  As a result, the Government does not appear to require the inherently prejudicial evidence of extramarital cheating as it attempts to prove its case as to 89 patient files.  Nor would any probative value of the extramarital affairs exceed the inescapable prejudicial impact under Fed. R. Evid. 403, as the Government proves with an expert that Dr. Bado was unfaithful.  For these reasons, the Court should preclude Dr. Thomas from discussing extramarital affairs, and from basing any opinions on them at trial.

---

[2] In medicine, as in law and psychology, the professional rules that govern practitioners' ethical obligations do not constitute substantive law.  <u>See</u> <u>Thierfelder v. Wolfert</u>, 617 Pa. 295, 52 A.3d 1251, 1278-1285 (2012) (declining to extend tort liability to physicians based on consensual sex with a patient, while observing that "in Pennsylvania, sexual contact between physicians and patients is deemed to be unprofessional, and it is expressly prohibited by the State Board of Medicine.").  However, this case is not about whether Dr. Bado's personal life comported with professional rules, but is instead about his prescribing of controlled substances. On that issue, evidence of extramarital affairs is irrelevant.  <u>See</u> Fed. R.E. 402.

**C.**   **Dr. Thomas offers wide ranging opinions without any specific connection to a named patient.**

"The net opinion rule is merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under [the fit requirement of] Rule 702 of the Federal Rules of Evidence." Holman Enterprises v. Fid. & Guar. Ins. Co., 563 F. Supp. 2d 467, 472 (D.N.J.2008).  The Third Circuit interprets Rule 702 and Daubert to provide three criteria for the admission of expert testimony: (1) qualifications of the expert, (2) reliability of the opinions, and (as noted in Holman); (3) an acceptable "fit" between the opinions and the underlying facts. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir.1994), cert. denied, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995) ("Paoli II" ); Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.2000).[3]

Expert testimony "fits" the subject matter if it assists the trier of fact in understanding the evidence or to determine a fact in issue.  Daubert at 591; Schneider ex rel Est. of Schneider v. Fried, 320 F.3d 396, 405 (3d Cir.2003). "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir.2000) (quoting Paoli II at 743).  An expert who proffers an opinion based on factual assumptions not present in the case "cannot be said to 'assist the trier of fact,' as Rule 702 requires." Elcock, 233 F.3d at 756 n. 13. Related to the requirement of "fit," "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Electric v. Joiner, 522 U.S.

---

[3] The Government, as the party introducing expert testimony, has the burden to demonstrate, by a preponderance of the evidence, that the testimony is admissible under all three criteria. Daubert at 593, citing Bourjaily v. United States, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); In re TMI Litig., 193 F.3d 613, 663 (3d Cir.1999).

136, 142-145 (1997).

Dr. Thomas lists the 89 patient files, by name, at the start of his report.  See id. at 2-3.
That is the last the reader hears of any specific patient until page 11, when Dr. Thomas finally
groups patients under alleged deficiencies with Dr. Bado's prescribing.  See id. at 11.  In
between, Dr. Thomas offers a multitude of opinions, but none of them "fit" with the underlying
facts of an identified patient file.  At page 5 of his report, Dr. Thomas opines that "the drug doses
were so high that they represented an immediate danger to the patient's health," but does not
identify the drug, the dose, or the patient.  See Exhibit B at 5.  On the same page, Dr. Thomas
opines that "in these instances, the well-being and care of patients cannot have been Dr. Bado's
aim or motivation."  Id.  However, Dr. Thomas does not specify what "instances" he is talking
about, or the patients involved in them.  Still on page 5, Dr. Thomas states: "In my opinion,
writing multiple prescriptions for one drug in too high a dose to be reasonable or necessary for
the treatment of any chronic non-malignant pain is unwarranted."  Id.  As before, Dr. Thomas
does not identify the prescription, dose, or patient that he is talking about.

Dr. Thomas' "generalist" approach to expert testimony continues on the following pages
of his report.  At page 6, Dr. Thomas states that "the cavalier manner in which Dr. Bado
provided these prescriptions to this group of high-risk patients was shocking," but does not
identify what prescriptions or "high-risk patients" he is talking about.  Id. at 6.  At page 7, Dr.
Thomas levels the charge that "Dr. Bado, fully aware of the evidence of elevated risk, routinely
prescribed inappropriately high doses of opioid to such patients, continuously ignoring the
repeated evidence of underlying substance abuse disorder."  Id. at 7.  Who are "such patients,"
how did they manifest "substance abuse disorder," when did those manifestations occur, and
when were the "inappropriately high doses of opioid" prescribed?  Dr. Thomas does not provide

13

the details.

Dr. Thomas' conclusory statements without citation to a factual record continue at page 7 ("To knowingly contribute to the burgeoning black market in prescription drugs is outside the scope of a physician's usual professional practice."); at page 8 ("In Dr. Bado's patient population, negative urine drug screens were frequently found, and repeatedly ignored."); page 9 ("The medical records show that Mr. Thomas would with an untrained eye observe the patients, perform vital signs, and hand them prescriptions for money."); and page 10 (alleging Dr. Bado's "inability to face patients with drug problems and tell them the medical truth about their medical condition."). None of these opinions includes the support of specific facts from an identified patient file. Instead, Dr. Thomas paints with the broadest brush available.

The first question that arises in response to each of the above allegations is "what patient file is he talking about?" The next questions are "what visit?" and "what prescription?" and "when was it filled?" Dr. Thomas provides none of this necessary supporting detail in the first ten pages of his report. The results are countless "net opinions," delivered in authoritative terms, but without any identified factual support. These opinions do not "fit" with the underlying facts, because Dr. Thomas does not provide those facts in his report. See Joiner, 522 U.S. at 145 (noting that a District Court may conclude "that there is simply too great an analytical gap between the data and the opinion proffered.").

**D.    Dr. Thomas discusses numerous patient files not charged by the Government (including a death case), raising the fundamental error of a constructive amendment to the Superseding Indictment.**

A constructive amendment arises when the potential bases for conviction are broadened at trial beyond those alleged by the indictment, and as a result, the defendant is convicted of an offense not considered and expressly approved by the Grand Jury. See Stirone v. United States,

361 U.S. 212, 217-19 (1960) (noting that "a Court cannot permit a defendant to be tried on charges that are not made in the indictment against him."); 10 John H. Merrill, The American and English Encyclopedia of Law 534 (1889) ("The general powers which courts have over pleadings does not extend to indictments, which cannot be amended without the concurrence of the grand jury by which they were found.").  It is elementary that procedural due process requires that a person be tried and convicted only for the specific offenses with which he is charged." United States v. Maselli, 534 F.2d 1197, 1201 (6th Cir. 1976).  Thus, "constructive amendment of an Indictment is error per se and is an independent ground for reversal on appeal even when not preserved by objection."  United States v. Roe, 606 F.3d 180, 189-90 (4th Cir. 2010), citing United States v. Floresca, 38 F.3d 706, 714 (4th Cir. 1994).[4]

Although Dr. Thomas is not a statistician, the final section of his report is devoted to discussing several additional patient files, that he identified through a random sampling, reportedly for the sake of "absolute completeness."  See id. at 12.  After conducting "as random a sampling as I could muster," Dr. Thomas criticizes the prescribing evidence contained in these patient files that are not mentioned in the Superseding Indictment.  See id. at 13-15.  In the case of Shannon Bland, Dr. Bado allegedly rewarded her "doctor shopping" by prescribing oxycodone and Percocet.  See id. at 13.  In the case of Donna Brown, Dr. Bado allegedly increased her prescriptions for Percocet, despite "spotty documentation."  See id.  For Robert Brusko, Dr. Bado allegedly prescribed ample amounts of oxycontin, oxycodone and valium "after minimal to no examination," and continued to prescribe those drugs despite Mr. Brusko testing positive for THC.  See id.  In the case of Michael Hinkle, Dr. Thomas chronicles an 11-month history of opioid prescriptions, which allegedly continued even though "Oxymorphone

---

[4] A constructive amendment, even when not objected to, is reviewable as plain error.  See Fed. R. Crim. P. 52 (b).

was absent from his system despite the marked increase in the amount supplied." <u>See</u> <u>id</u>. at 14. Dr. Thomas' critique of Dr. Bado's treatment of Frank Keller starts with the observation that "Dr. Bado immediately gave him 180 Oxycodone 30 mg tablets with two prescriptions," and extends through urine drug screens that Dr. Thomas suggests were ignored. <u>See</u> <u>id</u>.  In the case of Herbert Moore, Dr. Thomas faults the prescribing of "240 Oxycodone 30 mg tablets per prescription," apparently because of "minimal documentation" of a left total knee replacement. <u>See</u> <u>id</u>.  Dr. Thomas describes Dr. Bado's treatment of Gregory Thrush as "an instance in which Dr. Bado chose to prescribe to a high-risk individual with obvious signs of drug abuse at admission without adequate follow-up, verification, or monitoring of his drug-taking behavior." <u>Id</u>. at 14-15.

Notably, the specificity of Dr. Thomas' critique of each patient file discussed above far exceeds the detail he has provided for any indicted patient file.  Dr. Thomas ends his report with the most prejudicial content he could muster – an extended discussion of the case of Marvin Epstein, a patient of Dr. Bado's who was found non-responsive on December 18, 2009, and subsequently died on this 50th birthday.  <u>See</u> <u>id</u>. at 16.  While much of Dr. Thomas' discussion of the Epstein case ventures into speculation (<u>see</u> bottom of page 16: "Any additional even minor stress, such as a pillow over his airway or a face down sleeping position could have exacerbated the condition"), Dr. Thomas evidently places the blame for Epstein's death on Dr. Bado.  <u>See</u> <u>id</u>. ("The combined toxicity of the drugs could account for the patient's demise in a manner described as an 'adverse drug reaction.'").  Dr. Bado was not indicted for the death of Marvin Epstein, or for the other patient files discussed above, but Dr. Thomas' report puts Dr. Bado on trial for each patient.  The resulting constructive amendment would violate due process.[5]

---

[5] To the extent the Government claims that these new patient files are admissible under Fed. R.E. 404 (b), Dr. Bado incorporates the discussion in Section (B) above by reference.

III.    **CONCLUSION**

For the reasons discussed above, the defendant, Jeffrey Bado, D.O., asks the Court to enter an Order in the form submitted, precluding the Government's pain management practice expert, Stephen M. Thomas, M.D., from providing opinions at trial that are based upon the inadmissible portions of Dr. Thomas' report.

Respectfully submitted,

LAW OFFICES OF RICHARD MAURER, INC.

By:     _____
        Richard H. Maurer RM4782
        211 N. 13th Street, Suite 801
        Philadelphia, PA 19107
        (215) 755-9000
        (215) 755-9100 fax

        Counsel for Defendant, Jeffrey Bado, D.O.

September 4, 2015

UNITED STATES OF AMERICA      :
                :
    v.            :    **2:15-cr-00037-CDJ**
                :
**JEFFREY BADO**         :
                :

## ORDER

AND NOW, this _____ day of _____, 2015, upon

consideration of DEFENDANT'S MOTION IN LIMINE TO PRECLUDE STEPHEN M.

THOMAS, M.D., FROM PROVIDING CERTAIN OPINION TESTIMONY AT TRIAL, and

after considering the Government's written response to the Motion, along with Defendant's

Reply Brief and after hearing argument, it is hereby ORDERED as follows:

    1.    The Motion is GRANTED; and

    2.    Dr. Thomas is precluded from: (A) applying inflammatory and/or irrelevant

terms, including "unfathomable," "egregious," "horrifying," "shocking," "astonishing," "grossly

negligent on its face," "pill mill," "the Bado Organization" and "ethically unfit for the practice of

the profession" to refer to Dr. Bado and his prescribing of controlled substances; (B) discussing

or providing opinions based on Dr. Bado's extramarital affairs with patients; (C) offering any

opinions that are not supported by specific factual connections to a named patient and identified

prescription; and (D) discussing patient files not charged by the Government in the Superseding

Indictment.

                     BY THE COURT:


              _____

                 C. Darnell Jones, District Judge

## <u>CERTIFICATE OF SERVICE</u>

Richard H. Maurer hereby certifies that on the date stated below, he served a copy of

DEFENDANT'S MOTION IN LIMINE TO PRECLUDE STEPHEN M. THOMAS, M.D.,

FROM PROVIDING CERTAIN OPINION TESTIMONY AT TRIAL, with supporting Brief

and proposed Order, on the following counsel of record by electronic mail and/or by use of the

Court's ECF system as applicable:

Nancy Beam Winter, AUSA
Andrew J. Schell, AUSA
Jason Bologna, AUSA
U.S. ATTORNEY'S OFFICE
615 Chestnut Street, Suite 615
Philadelphia, PA 19106

nancy.winter@usdoj.gov
andrew.schell@usdoj.gov
Jason.bologna@usdoj.gov

LAW OFFICES OF RICHARD MAURER, INC.

By: _____
Richard H. Maurer
RM4782
The Belmont Building
211 N. 13th Street, Suite 801
Philadelphia, PA 19107
(215) 755-9000
(215) 755-9100 fax

September 4, 2015