**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | **NO. 15-37** |
| | : | |
| **JEFFREY BADO,** | : | |
| **Defendant.** | : | |

**Jones, II       J.**

**January 17, 2017**

**<u>MEMORANDUM</u>**

On October 24, 2016 Defendant filed the present Motion, pursuant to Federal Rule of Criminal Procedure 29(a), asking the court to enter a Judgment of Acquittal in favor of the defendant, Jeffrey Bado ("Defendant"), on Count III of the Superseding Indictment and on various drug related premises and unlawful distribution counts charged in Counts I, II, and IV through CCLXXXV of the Superseding Indictment. Count III of the Superseding Indictment charges Defendant with dispensing controlled substances, the use of which resulted in the death of a former patient. Defendant argues that a Judgment of Acquittal is appropriate as to Count III because the government failed to establish the requisite causal link between the controlled substances Defendant prescribed and the controlled substances the decedent ingested at the time of his death. Defendant further argues that the court should enter a Judgment of Acquittal for each charged count of maintaining a drug involved premises and each charged count of distribution of a controlled substance for which there was not specific expert testimony proffered in the government's case in chief. In the memorandum that follows, this Court considers the evidence adduced in the government's case in chief as to Counts I, II, and IV through

CCLXXXV and Count III of the Superseding Indictment. For the reasons that follow, Defendant's Rule 29 Motion for Judgment of Acquittal is DENIED.

## PROCEDURAL BACKGROUND

On January 10, 2015, a grand jury charged Dr. Jeffrey Bado ("Defendant") with two counts of maintaining a drug involved premises, in violation of 21 U.S.C. § 856, one count of unlawful distribution of a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), 282 counts of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), thirty-three counts of health care fraud, in violation of 18 U.S.C. § 1347, and four counts of making materially false, fictitious, or fraudulent statements, in violation of 18 U.S.C. § 1001. Each count of the 322-count Superseding Indictment stemmed from Defendant's practice as a physician from 2010 through 2013.

On September 7, 2016 the parties commenced jury selection through the use of written questionnaires and individual questioning by the court and counsel, and on September 19, 2016, the parties presented opening statements in the matter of the United States v. Jeffrey Bado. At the conclusion of the government's case-in-chief, on October 24, 2016, Defendant filed the present Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). As is permitted by Rule 29, this Court reserved ruling on Defendant's Motion so as to permit thorough review of the transcripts and pertinent precedent. On November 22, 2016, this Court held oral arguments on Defendant's Rule 29 Motion, during which the parties presented their respective positions regarding the sufficiency of the evidence presented in the government's case-in-chief and the propriety of Judgment of Acquittal as to Counts I, II, and IV through CCLXXXV, and Count III of the Superseding Indictment.

On December 8, 2016, the jury returned a unanimous verdict finding Defendant GUILTY of both counts of maintaining a drug involved premises, GUILTY of unlawful distribution of a controlled substance resulting in death, GUILTY of all but twelve of the 282 counts of unlawful distribution of a controlled substance, GUILTY of thirty three counts of health care fraud, and GUILTY of all but one of the four counts of making false, fictitious, or fraudulent statements. Now pending before the court is Defendant's Motion for Judgment of Acquittal (Dkt No. 210), the government's response thereto (Dkt No. 225), and Defendant's reply in support of the Rule 29 Motion (Dkt No. 245).

**LEGAL STANDARD**

Federal Rule of Criminal Procedure 29 directs that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29. Because the court reserved ruling on the Motion made at the conclusion of the government's case-in-chief, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." FED. R. CRIM. P. 29. In ruling on a Motion for Judgment of Acquittal, the court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (quoting United States v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001)). As a result, a finding of insufficiency should be "confined to cases where the prosecution's failure is clear." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (internal citations omitted). The court must be ever vigilant "not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Id.

3

**DISCUSSION**

I.    **There was sufficient evidence adduced in the government's case in chief to support a reasonable finding of guilt as to Counts I, II, and IV-CCLXXXV of the Superseding Indictment.**

Counts I and II of the Superseding Indictment charge Defendant with having unlawfully maintained a drug involved premises, in violation of 21 U.S.C. § 856, and Counts IV-CCLXXXV charge Defendant with having unlawfully distributed or dispensed controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  A determination of guilt under 21 U.S.C. § 856 requires proof that the defendant knowingly rented, used, or maintained a property for the purpose of unlawfully distributing controlled substances. A registered physician, who would otherwise be authorized to dispense controlled substances, can be prosecuted for unlawful distribution when their activities fall outside the usual course of medical professional practice. United States v. Moore, 423 U.S. 122 (1975). Counts I, II, and IV-CCLXXXV each correspond to individual prescriptions issued by the Defendant that the government alleged were medically illegitimate and, thus, unlawful. The crux of the government's case as it relates to each of the aforementioned counts was that where the Defendant's prescribing practices fell outside the usual course of medical practice, Defendant's dispensing of controlled substances was criminal and punishable by law. Thus, to establish Defendant's guilt on Counts I, II, and IV-CCLXXXV of the Superseding Indictment, the government had to adduce sufficient evidence to prove beyond a reasonable doubt that Defendant issued each of the corresponding prescriptions outside the usual course of medical practice and not for a legitimate medical purpose.

As noted by Defendant in his Motion, whether a given prescription fell outside the usual course of professional practice and is not for a legitimate medical purpose was "beyond the ken of the jury, and therefore…require[d] competent expert testimony." (R. 29 Motion, 11). To

provide said expert testimony, on October 3, 2016 the government called Doctor Stephen Thomas to testify as to the medical legitimacy of the prescriptions written by Defendant which correspond to Counts I, II and IV through CCLXXXV of the Superseding Indictment – 282 prescriptions spanning across eighty nine total patient files. After being qualified as an expert, Doctor Thomas spent the first few hours of his testimony providing the jury with an elementary understanding of pain management and explaining overarching medical standards against which to compare Defendant's prescribing practices.  For example, Doctor Thomas explained that in the practice of pain management, it is imperative that physicians collect a comprehensive medical history from all new patients (Thomas Testimony 1, 84); that it cannot be medically legitimate for a doctor to provide patients with prescription renewals for opiate medications on their first office visit (Thomas Testimony 1, 88); and that it is the role of the physician to investigate when patients' urine tests present evidence of abuse or diversion (Thomas Testimony 1, 98). Doctor Thomas testified that, in preparation for trial, he thoroughly reviewed each of the patient files that include allegedly unlawful prescriptions corresponding to a charged count in the Superseding Indictment. (Thomas Testimony 1, 82). Doctor Thomas ultimately concluded that in each charged patient file he reviewed, he found evidence of medically illegitimate prescribing practices – instances where Defendant acted in contravention to established standards within the medical community. (Thomas Testimony 3, 10). To illustrate this assertion, Doctor Thomas spent the better part of two days meticulously analyzing the details of nine of the patient files charged in the Superseding Indictment.

For each of the nine patient files, Doctor Thomas addressed the adequacy of the medical history collected at the start of the doctor-patient relationship, the type of pain generally associated with the patient's claimed injury or ailment, the propriety of the prescriptions

Defendant wrote, the sufficiency of Defendant's charting and notes, any evidence of abuse or diversion, and the ways in which Doctor Thomas felt Defendant's prescribing practices fell below the threshold of medical legitimacy. Doctor Thomas testified that the nine patient files highlighted common themes of Defendant's medically illegitimate prescribing practices, and that each of the eighty-nine charged patient files could be categorized into one of five kinds of medically deficient prescribing practices. Specifically, Doctor Thomas testified that each patient file contained evidence that: (1) the patient was prescribed too high of a dose of opiate medication to be medically legitimate, (2) the defendant failed to attempt to establish that there was any medically legitimate reason to prescribe controlled substances to the patient, (3) the patient was prescribed controlled substances despite evidence of drug abuse or Substance Use Disorder, (4) the patient was prescribed controlled substances despite evidence of drug diversion, and/or (5) the patient was issued a "bridging prescription" after being discharged for abusing or diverting the drugs Defendant prescribed. (Thomas Testimony 1, 116-117).

After Doctor Thomas addressed the nine individual patient files, the government moved to admit a chart that listed the eighty nine patient files containing prescriptions charged in the Superseding Indictment and identified to what category or categories of deficient prescribing practices each patient file should be assigned, in Doctor Thomas's expert opinion. (Thomas Testimony 2, 158). Defendant objected to the admission of this chart, claiming that to allow Doctor Thomas to present his ultimate conclusions as to patient files not yet discussed with the jury would violate Defendant's constitutional rights as guaranteed to him by the Confrontation Clause of the Sixth Amendment. (Thomas Testimony 2, 170).  Before this Court could rule on Defendant's objection, the government informed the court of its intention to have Doctor Thomas testify as to what each category of deficient prescribing practices represented and how

Doctor Thomas concluded which patient files fell within which categories. (Thomas Testimony 3, 5).

On the third and final day of Doctor Thomas's testimony, October 5, 2016, the government provided Doctor Thomas with a list of the eighty nine patients whose files contained the prescriptions underlying Counts I, II, and IV-CCLXXXV of the Superseding Indictment. The government went through the list, in alphabetical order, and for each patient: (1) indicated which counts in the indictment corresponded to prescriptions within the patient's file, (2) asked Doctor Thomas to which category or categories of deficient prescribing the patient file was assigned, and (3) examined Doctor Thomas's rationale for so sorting the patient file. Wherever a patient file was sorted into the "patient prescribed too high of a dose" category, the government would ask if a particular prescription or prescriptions were the basis for Doctor Thomas's conclusion. (Thomas Testimony 3, 37)("With regard to too high…was that because [Heather Charro] received a prescription on her visit on 3/15/2011 of 480 methadone 10 milligram tablets and 240 oxycodone 30 milligram tablets, and she received a two month supply for both of those substances?"). Wherever a patient file was sorted into the "Defendant failed to establish a basis for prescribing controlled substances" category, Doctor Thomas identified what diagnostic tests, if any, were contained in the file, what diagnostic conclusions Doctor Thomas drew from the tests, and whether that diagnosis supported the prescriptions the patient received. (Thomas Testimony 3, 33) ("Was it your conclusion that [Lamont Brown] had a minimally abnormal lumbar MRI with nonspecific low back pain…Would that be a diagnosis that would be inconsistent for the prescribing of oxycodone tablets, at least in the quantities that he was receiving?"). Wherever a patient was sorted into the "patient prescribed controlled substances despite evidence of abuse" category, the government asked Doctor Thomas whether specific

urine tests – providing the dates of each – were the evidence of drug abuse to which he referred. (Thomas Testimony 3, 85) ("And with regard to drug abuse or Substance Use Disorder, did you consider urine screens that were done on 8/27/2010 that showed positive for methadone?...and that screen was taken prior to [Samantha Malaszecki] being prescribed Methadone by the defendant, is that correct?"). Wherever a patient file was sorted into the "patient prescribed controlled substances despite evidence of diversion" category, the government asked Doctor Thomas whether specific urine tests – again providing dates – were the evidence of diversion to which he referred. (Thomas Testimony 3, 94) ("With regard to diversion, sir, did you consider the urine drug screens on 7/31/2011 that showed no oxy metabolite in [Frank Modzianowski's] system?"). Doctor Thomas testified that, by definition, a bridging prescription – intended to help a discharged patient avoid or minimize the experience of drug withdrawal – could never be for a medically legitimate purpose. (Thomas Testimony 2, 120). Wherever a patient file was sorted into the "patient provided a bridging prescription at the time of discharge" category, the government asked Doctor Thomas if a particular prescription was the illegitimate prescription to which he had referred. (Thomas Testimony 3, 135)("And with regard to those [positive drug screening] results, sir, still Dr. Bado issued a bridging prescription to [Carol Yancer]?...And that was on 7/16/2012?...And that was for 360 oxy 30s and 120 perc 10s?").

Given the foregoing, it is difficult to understand what about Doctor Thomas's testimony Defendant finds to be insufficient to support a reasonable finding of guilt as to Counts I, II, and IV through CCLXXXV of the Superseding Indictment. Doctor Thomas provided the jury with a basic understanding of the practice of pain management and the public health concerns upon which the prevailing professional standards are based. Doctor Thomas analyzed nine patient files page by page to illustrate the common themes of deficient prescribing practices evident in

8

Defendant's conduct as a pain management physician. And Doctor Thomas went through each of the remaining eighty patient files and identified what evidence supported his conclusions that the prescriptions contained in the files and corresponding to charged counts in the Superseding Indictment were medically illegitimate. Doctor Thomas did not organize his findings in a manner identical to the organization of the charged counts in the Superseding Indictment, but that alone does not render his testimony insufficient to support a reasonable finding of guilt. Doctor Thomas provided an adequate foundation for each of his conclusions and equipped the jury with enough information to reasonably determine which prescriptions fell outside the usual course of professional practice.

Because this Court finds that Doctor Thomas's testimony provided sufficient expert testimony to allow for a reasonable finding of guilt on each of Counts I, II, and IV-CCLXXXV, Defendant's Motion for Judgment of Acquittal is denied as to Counts I, II, and IV-CCLXXXV.

II.    **There was sufficient evidence adduced in the government's case in chief to support a reasonable finding of guilt as to Count III of the Superseding Indictment.**

Count III of the Superseding Indictment charges Defendant with having unlawfully dispensed controlled substances – specifically Oxycodone and Methadone – the use of which resulted in the death of Defendant's former patient Joseph Armstrong ("Armstrong"). Armstrong died 24 days after filling prescriptions – written by Defendant – for 120 pills containing 80 milligrams of Oxycodone, 120 pills containing 30 milligrams of Oxycodone, and 240 pills containing 10 milligrams of Methadone. Blood samples obtained the day after Armstrong's death confirmed the presence of varying levels of Oxycodone and Methadone in Armstrong's system at the time of his death.

Pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(C), unlawful distribution resulting in death requires proof of the following four elements: (1) Defendant distributed or dispensed a mixture or substance containing a controlled substance; (2) the distribution was knowing and intentional; (3) Defendant distributed/dispensed the controlled substance outside of the course of professional practice and not for a legitimate medical purpose; and (4) death resulted from the use of the controlled substance. (Third Circuit Model Jury Instructions 6.21.841B; Modern Federal Jury Instructions Criminal 56.02). For the purposes of Defendant's present Motion, Defendant does not challenge the sufficiency of the evidence adduced in the government's case in chief as to the first three elements of the standard for proving guilt under § 841(a)(1), (b)(1)(C). Moreover, Defendant does not appear to argue that there is insufficient evidence upon which a reasonable jury could find that Armstrong died as a result of ingesting Oxycodone and Methadone. Instead, the Defendant argues that the prosecution failed to establish a legally sufficient basis upon which a reasonable jury could find that Armstrong's death resulted from the use of the controlled substances Defendant specifically prescribed. The court will therefore limit the scope of its review to the adequacy of the government's evidence linking Defendant to the pills Armstrong consumed at the time of his death.

"To find that death or serious bodily injury resulted from the use of the substance…the government must prove beyond a reasonable doubt that the [death] would not have resulted had the victim not used the controlled substance[s] *distributed by [Defendant]*." (Third Circuit Model Jury Instructions 6.21.841B) (emphasis added). The crux of Defendant's Motion, as it relates to Count III of the Superseding Indictment, is the government's alleged inability to connect the prescription drugs Armstrong ingested at the time of his death to that which Defendant prescribed nearly a month earlier. Defendant asserts that the government's case is devoid of any

evidence as to the origination of the prescription pills Armstrong ingested on February 17, 2011. In its case in chief, the government did not introduce a pill bottle bearing Defendant's name or directly corresponding to a prescription Defendant issued. The detective who visited Armstrong's residence after Armstrong had been removed by the paramedics neither searched the house nor recovered a prescription pill bottle. Neither the Medical Examiner nor the Toxicologist who testified in the government's case in chief were able to identify the origins of the controlled substances found in Armstrong's system post-mortem. And the government did not introduce a witness who could testify to observing Armstrong remove pills from a prescription bottle in the days leading up to his death. According to Defendant, in the absence of any such evidence connecting Defendant's prescriptions to the pills Armstrong ingested in the days leading up to his death, the standard of proof cannot be met under § 841(a)(1), (b)(1)(C). In contrast, the government argues that the testimony of Armstrong's wife, Melissa Orler, and the temporal characteristics of the prescriptions Defendant wrote for Armstrong in the months before his death are together legally sufficient for a finding of guilt on Count III of the Superseding Indictment. The court considers each piece of evidence in turn.

A.    Testimony of Melissa Orler

The majority of the government's opposition to Defendant's Rule 29 Motion rests on testimony provided by Armstrong's common law wife, Melissa Orler, on October 19, 2016. Orler testified that both she and Armstrong had been patients of the Defendant's pain management practice for about a decade, and that during that time Defendant prescribed Armstrong Oxycontin – a commercial form of Oxycodone – Methadone, Percocet, and Xanax. (Orler Testimony, 9-11). Orler indicated that in the five days leading up to his death, Armstrong was "out of it" and clearly under the influence of drugs. (Orler Testimony, 11-12). Orler testified

that Armstrong often purchased drugs on the street, that she accompanied Armstrong on ninety

percent of these street buys, and that to her knowledge, Armstrong only ever purchased Crack-

Cocaine from street dealers. (Orler Testimony, 12). According to Orler, Armstrong never

purchased prescription pills on the street because "he had enough" from Defendant. (Orler

Testimony, 13). Orler testified that after filling the prescriptions Defendant issued to him,

Armstrong would routinely count the number of pills he had "over and over," and place them all

in a lockbox in the couple's bedroom. (Orler Testimony, 13). Orler admitted that Armstrong

often sold half of his prescriptions and kept the remaining pills for personal use. (Orler

Testimony, 32).

Orler testified that in the hours leading up to Armstrong's death, she placed Armstrong in

their son's bed to rest, and that she checked on Armstrong every ten to twenty minutes to make

sure that he was breathing. (Orler Testimony, 15-16). While checking on him, Orler indicated

that she searched Armstrong's pockets and removed any drugs she could find, so that Armstrong

could not ingest anything more. (Orler Testimony, 16-17). Orler testified that she removed what

she recognized to be "three OxyContin [pills] and…four bags of Crack" from Armstrong's

pockets. (Orler Testimony, 17). Orler testified that soon thereafter, she found Armstrong

unresponsive, began CPR, and called for an ambulance. (Orler Testimony, 17). Armstrong was

pronounced dead not long after arriving at Roxborough Memorial Hospital.

Orler testified on direct that she was addicted to drugs both at the time of Armstrong's

death and at the time that she provided the above detailed testimony. (Orler Testimony, 39). On

cross, Orler described her condition at the time of testifying as "a retched mess," and confirmed

that in addition to grappling with drug withdrawal, Orler had not taken her prescription anxiety

medication. (Orler Testimony, 39). According to Orler, Armstrong's incessant examination of

his prescription pills was, in part, the result of her addiction and occasional relapses. (Orler Testimony, 14).

Defendant argues that Orler's testimony was insufficient to establish a causal link between the prescriptions Defendant wrote on January 24, 2011 and Armstrong's death on February 17, 2011. First, Defendant argues that Orler's testimony established that Armstrong regularly purchased illegal drugs from street dealers, so that it would be entirely plausible that Armstrong had access to prescription pills from sources other than the defendant. Second, Defendant notes that Orler admittedly did not accompany Armstrong on all his trips to purchase the illicit drugs, so she could not testify with any certainty that Armstrong never purchased prescription pills from street dealers. Finally, Defendant points to Orler's testimony that she was a "vulture" when it came to consuming drugs and that she would occasionally relapse and use some of Armstrong's prescription pills. Defendant suggests that, collectively, such testimony buoys the possibility that Armstrong ran out of the pills Defendant prescribed and sought out other providers to satiate his need for Oxycodone and Methadone pills.

This Court is unconvinced that the deficiencies Defendant identifies in Orler's testimony amount to legal insufficiency warranting the granting of a Rule 29 Motion. If the government's case in chief survives Defendant's Rule 29 Motion, it is for the jury, and not this Court, to resolve the discrepancies in Orler's testimony. In this Court's assessment, according all reasonable inferences to the government as is required for the present Motion, Orler's testimony established that Armstrong incessantly counted and recounted the pills Defendant prescribed to him each month; Orler's testimony established that she accompanied Armstrong on the overwhelming majority of his trips to Kensington to purchase illegal drugs, and that in all of their trips, Orler never witnessed Armstrong purchasing *any* drug other than Crack-Cocaine; and

13

Orler's testimony established that in their decade-long relationship with Defendant, she and Armstrong received more than enough prescription pills from Defendant to both sell and satisfy their respective addictions. Of note, while for the purposes of a Rule 29 Motion the court does not determine the credibility of witnesses, United States v. Haywood, 363 F.3d 200, 204 n.3 (3d Cir. 2004) (internal citations omitted), this Court found Orler to be composed, coherent, and appropriately responsive.

Defendant is correct that there was no direct evidence concretely linking Defendant to the prescription pills Armstrong ingested at his time of death. But, the government's case need not be ironclad to survive a Rule 29 inquiry. "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990). The jury is permitted to rely on circumstantial evidence based on reasonable inferences drawn from actions, statements, and witness testimony – like that of Melissa Orler. For the foregoing reasons, this Court finds that a reasonable jury could credit Orler's testimony as true, find that Armstrong relied exclusively on Defendant to provide prescription pills, and reasonably infer that the Oxycodone and Methadone found in Armstrong's system post mortem were that which Defendant prescribed.

B.    Temporal Proximity Between Prescriptions

Though not addressed in its briefing, at oral argument the government argued that the temporal characteristics of the last two prescriptions Defendant wrote for Armstrong provided evidence upon which the jury could reasonably find that the pills Armstrong ingested were that which Defendant specifically prescribed. Because Armstrong died twenty four days following the issuance of a prescription intended to last Armstrong a full month, the government argued

14

that a reasonable jury could find that at the time of his death, Armstrong should have had six to seven days' worth of pills remaining on his last prescription. (Hearing Transcript, 26). Moreover, the government argued that Armstrong received the January 24, 2011 prescription only 28 days after the Defendant provided Armstrong with a month supply of prescription pills on December 27, 2011, such that Armstrong would have had pills remaining even before filling the January prescription. (Hearing Transcript, 26). The government argued that because Armstrong should have had pills remaining from the last prescription Defendant issued, Armstrong would not have needed to buy the prescription pills he ingested from any other source.

The Court struggles with the cogency of this argument. If we regard Orler's testimony as credible – as is required – Armstrong was not only a drug abuser, but also a drug dealer who would routinely sell half of the pills Defendant prescribed to him. To that end, the Court cannot fathom how a reasonable jury could believe that Armstrong took the pills as prescribed by Defendant or in any other routine manner that would allow for a reasoned calculation of the number of pills remaining at the end of each prescription cycle.

Despite the inadequacy of this argument, this Court finds that relying on Melissa Orler's testimony alone, a reasonable jury could find that Defendant was Armstrong's sole provider of prescription pills and that at the time of his death, Armstrong ingested the Oxycodone and Methadone pills he received from Defendant on January 24, 2011. Because the Government was able to adduce sufficient evidence to satisfy the final element of the standard for proving guilt under § 841(a)(1), (b)(1)(C), Judgment of Acquittal is also inappropriate as to Count III of the Superseding Indictment.

**CONCLUSION**

Whether the evidence presented in the government's case in chief would suffice to convince this Court of Defendant's guilt is immaterial.  An inquiry into the legal sufficiency of the evidence presented to the jury "does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 473 U.S. 307, 318-319 (1979). This Court carefully considered hundreds and hundreds of pages of trial transcripts and is satisfied that there was sufficient evidence presented in the government's case in chief to allow for a finding of guilt on each count of the Superseding Indictment. As such, the court is unwilling to grant the defendant's Motion for Judgment of Acquittal as to Count III or Counts I, II, and IV through CCLXXXV of the Superseding Indictment.

Defendant's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 is DENIED. An appropriate order follows.

BY THE COURT:

/s/ C. Darnell Jones, II
C. Darnell Jones, II    J.