**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | NO.: 15-37 |
| | : | |
| JEFFREY BADO, | : | |
| *Defendant/Petitioner.* | : | |

## MEMORANDUM

Jones, II   J.                                                    June 16, 2021

## I.   Introduction

Jeffrey Bado ("Petitioner") brings the instant *pro se* Motion to Vacate, Set Aside, or

Correct Sentence under 28 U.S.C. § 2255 (ECF No. 373) (hereinafter "Motion").  Though this

filed Motion is vague and lacks much explanation, a *pro se* Motion for Appointment of Counsel

(ECF No. 374) filed the same day makes several, specific claims of ineffective assistance of

counsel.  Construing those arguments as the basis for his present Motion, the Government filed a

Response in Opposition (ECF No. 381), arguing that Petitioner's counsel's performance was not

deficient, and, even if any errors occurred, Petitioner was not prejudiced.  Petitioner filed a Reply

in support of his Motion (ECF No. 386) that reiterates his allegations of ineffective assistance.

For the reasons set forth herein, Petitioner's Motion is denied, and a certificate of appealability

will not be issued.

## II.   Factual and Procedural History

Petitioner ran a medical office in Roxborough, Pennsylvania at Roxborough Memorial

Hospital from August 2009 through June 2011.  In 2010, he shifted his practice from internal

medicine to pain management and saw an explosion in gross receipts, increasing from $581,000 in 2009 to $1.2 million by 2011. This increase was due, at least in part, to Petitioner prescribing his patients controlled substances, most notably the opioids oxycodone and methadone.

One such patient was Joseph Armstrong. Mr. Armstrong first saw Petitioner in 1998 for anxiety and was prescribed Xanax. After a gap in treatment, in November 2008, Petitioner prescribed him Oxycontin and Percocet. By October 2009, Petitioner doubled this prescription even though there was no noted change in Mr. Armstrong's medical history. Again, in January 2010, Petitioner increased both prescription dosages, despite Mr. Armstrong's urine tests clearly showing he was using cocaine. In December 2010, Petitioner sent Mr. Armstrong a letter discharging him as a patient, but Mr. Armstrong's charts show Petitioner continued to prescribe him methadone and oxycodone nearly one month later, on January 24, 2011. Shortly thereafter, on February 17, 2011, Mr. Armstrong died of a drug overdose.

Concerned by the behavior of Petitioner's patients, like Mr. Armstrong, and about his practice generally, the following occurred: Roxborough Memorial Hospital's CEO terminated Petitioner's lease in the Hospital in June of 2011, multiple pharmacies in the area stopped filling prescriptions issued by Petitioner, and many of his office employees quit. As a result, Petitioner opened a new office called Comprehensive Pain Consultants in Bryn Mawr, Pennsylvania. Petitioner charged new patients $800 and returning patients $400 in cash for an office visit, and he did not accept insurance. Suspicious of how patients who were unemployed or underemployed could afford these fees, the Federal Bureau of Investigation ("FBI") began a years-long investigation, and on January 16, 2013, the FBI seized all his patient files.

Nearly two (2) years later, on January 10, 2015, a grand jury in the Eastern District of Pennsylvania returned a 322-count superseding indictment, charging Petitioner with the

following: two (2) counts of maintaining a drug-involved premises, in violation of 21 U.S.C. §
856; one (1) count of distribution of a controlled substance resulting in death, in violation of 21
U.S.C. § 841 and 18 U.S.C. § 2; 282 counts of distribution of a controlled substance, in violation
of 21 U.S.C. § 841 and 18 U.S.C. § 2; 33 counts of healthcare fraud, in violation of 18 U.S.C. §
1347 and 18 U.S.C. § 2; and four (4) counts of making false statements, in violation of 18 U.S.C.
§ 1001. *See* Indictment, ECF No. 1.

Prior to Petitioner's trial, his attorney, Richard Maurer, filed numerous motions that led
to evidentiary hearings and/or arguments before this Court. Though this Court, ultimately,
denied Mr. Maurer's motions, they represent a comprehensive pre-trial effort by Mr. Maurer to
dismiss hundreds of the charges against Petitioner.

### A. The Trial

At Petitioner's trial, the Government presented testimony from seventeen (17) former
patients. Sixteen (16) of which testified that Petitioner prescribed them such large quantities of
medication, they could take some and sell the rest. The only witness who did not testify
accordingly was a patient who cooperated with the FBI and, ultimately, gave her prescriptions to
the FBI instead of filling them. Many of the former patients further testified about their
addictions to oxycodone and/or methadone and how Petitioner failed to address them. Two
former patients also described having sexual relations with Petitioner as they were being treated.

#### 1. Dr. Stephen Thomas's Expert Testimony

In addition to these patient witnesses, the Government also called expert witness, Dr.
Stephen Thomas, to discuss Petitioner's treatment methods. After reviewing Petitioner's 89
patient files, Dr. Thomas testified to a reasonable degree of medical certainty that Petitioner's
prescriptions were medically unnecessary and fell outside the usual course of professional

practice.  Dr. Thomas's opinion was largely explained through key deficiencies in the treatment

of nine (9) patients.  The testimony for each of these patients substantively mirrored each other.

One such patient was Bernard Jackson. At Mr. Jackson's first appointment, he was taking

no medications, as was confirmed by a urine sample.  Appellate Record (hereinafter "App."),

ECF Nos. 391-392, 241:8-11, 257:1-9.  Dr. Thomas stated that even though a person who was

taking no medication could not be tolerant to opioid analgesics, Petitioner prescribed Mr.

Jackson 360 milligrams of oxycodone a day (the equivalent of 480 milligrams of morphine per

day) at this first visit.  App. 255:18-25, 265:1.  "[R]oughly 65 milligrams of oxycodone or 25

milligrams of methadone" a day represents a high dose of opioids, and if someone like Mr.

Jackson, who was opiate free, were to take such large quantities of medications, Dr. Thomas

expected them "to die."  App. 241:24-25, 242:1-2, 257:18-22.

Months after receiving this prescription, Mr. Jackson submitted another urine sample that

tested positive for Xanax, buprenorphine, codeine, THC, and showed evidence of an attempt to

dilute the sample.  App. 264:1-23.  Having reviewed this sample, Dr. Thomas stated that "[u]sing

THC with high dose opioids is drug abuse, period."  App. 265:18.  Moreover, "buprenorphine is

used for the treatment of withdrawal," and Mr. Jackson had to be taking the prescribed drugs "in

an exorbitant fashion or diverting them."  App. 265:19-23.  This information, in conjunction with

other notations in Mr. Jackson's file, led Dr. Thomas to conclude that Petitioner prescribed Mr.

Jackson too high of an opioid dose.  With the evidence of drug abuse and diversion, Dr. Thomas

stated that Mr. Jackson was not using the opioids prescribed by Petitioner but selling them.

### 2.  The Death of Joseph Armstrong

Not only did the evidence at trial show that Petitioner was selling opioid prescriptions to

his patients, but his prescriptions caused one of his patients, Joseph Armstrong, to die.  The

autopsy of Mr. Armstrong showed he had oxycodone, methadone, Xanax, and cocaine in his blood stream at the time of his death.  Based on these results, the then retired Assistant Medical Examiner who performed the autopsy, Dr. Edwin Liberman, testified that "but for" Mr. Armstrong's use of oxycodone and methadone, he would have lived.  App. 842:8-9.  Dr. Liberman explained that Mr. Armstrong died of a pulmonary edema which starved Mr. Armstrong's organs of oxygen.  831:22-25, 832:1-5.  This oxygen shortage was caused by opioids, and Dr. Liberman testified that neither the cocaine in his system nor his coronary heart disease contributed to Mr. Armstrong's death.  App. 832:21-25, 836:1-15.

On cross-examination, Petitioner's counsel, Richard Maurer, attempted to undermine the credibility of Dr. Liberman's conclusions.  Specifically, Mr. Maurer reiterated that Dr. Liberman was not board certified in internal medicine.  App. 820:13-14.  Dr. Liberman did not deny that he lacked this certification, and the jury was able to consider such qualification when weighing the strength of Dr. Liberman's opinions and conclusion.

Dr. Liberman's conclusion around Mr. Armstrong's death was reiterated by Dr. Richard Fruncillo, an expert in pharmacology and toxicology.  Dr. Fruncillo testified that, based on his calculations, the amount of oxycodone in Mr. Armstrong's blood was two-to-three times higher than it would have been had Mr. Armstrong taken the pills as Petitioner had prescribed them. App. 901:16-21.  Based on the high percentage of opioids in his body, Dr. Fruncillo testified that Mr. Armstrong died of an overdose.  App. 901:22-25.

Mr. Armstrong's death was attributed to Petitioner's prescriptions through the testimony of Melissa Orler, Mr. Armstrong's ex-wife.  Ms. Orler testified that both she and Mr. Armstrong were Petitioner's patients for a little over a decade.  App. 776:19-23, 777:9-18.  She stated that

Mr. Armstrong only received medication from Petitioner and never purchased oxycodone pills

on the street because he "had enough" from the prescriptions.  App. 779:20-25, 780:1-5.

When Petitioner's counsel, attempted to cross-examine Ms. Orler on the source of Mr.

Armstrong's oxycodone, Ms. Orler admitted that Mr. Armstrong would run out of the oxycodone

"if he oversold them or if [she] relapse[d]."  799:7-11.  When Mr. Maurer followed up on this

point and asked if Mr. Armstrong would go to the street to purchase oxycodone, Ms. Orler

responded, "Never, not once.  I'm not going to lie."  799:12-16.  Mr. Maurer further asked if Ms.

Orler had also used Mr. Armstrong's prescription.   App. 802:22-23.  This was a point that Ms.

Orler denied, stating that Mr. Amrstrong kept his pills in a lockbox, and she "never" stole his

medication.  App. 802:16-24.

### 3.   The Defense Case

After cross-examining the Government's witnesses, Petitioner's counsel, Mr. Maurer,

presented evidence from October 24, 2016 through November 28, 2016.  Mr. Maurer called

Petitioner as the first witness who was qualified as an expert in pain management.  Petitioner

testified for weeks, categorically rejecting the allegations made in the superseding indictment

and critiquing the testimony offered by the government's witnesses.

In addition to the Petitioner's own expert testimony, Mr. Maurer called both Dr. Lee

Blum, a board-certified Toxicologist, and Dr. Charles V. Wetli, a board-certified Pathologist and

nationally recognized expert in cocaine-related deaths.  Both experts rebutted Dr. Liberman's

and Dr. Fruncillo's conclusions regarding the importance of the cocaine in Mr. Armstrong's

system and his coronary heart disease as contributing to his death.

After the expert testimony, Mr. Maurer called three (3) of Petitioners former patients to

testify regarding the pain treatment they sought.  Each testified that Petitioner's opioid treatment

provided them relief from their grave pains.  While Mr. Maurer also attempted to introduce the testimony of a fourth patient, the patient was unresponsive to his requests to attend the trial.[1] Though Mr. Maurer took an *ex parte* deposition on the Wednesday before Thanksgiving, a date the attorney for the Government could not attend, the Court denied the admission of the testimony because Mr. Maurer did not subpoena the witness for trial.

### 4. Petitioner's Trial Colloquy

When the defense rested its case-in-chief, the Court asked Petitioner a series of questions about the presentation of the defense witnesses and the performance of Mr. Maurer.  Notably, the following exchange occurred while Petitioner was under oath:

> THE COURT: Now, sir, is there anybody that you want to present as evidence in your behalf in this case that has not been presented?
>
> THE DEFENDANT: I'm satisfied at this point, Your Honor.
>
> THE COURT: Is there any evidence in any matter that you want to present on your behalf that has not been presented?
>
> THE DEFENDANT: No, I'm satisfied, Your Honor.
>
> THE COURT: Are you satisfied [with] the representation your counsel, Mr. Maurer, has provided you up to this point in time?
>
> THE DEFENDANT: Yes, I am.

---

[1] By way of background, approximately one month before Thanksgiving, the Court informed the jury that the Court would not be sitting on the Wednesday before (November 23, 2016) or the Friday after (November 25, 2016) Thanksgiving.  The Court concluded on Tuesday, November 22, 2016, at about 2:30 p.m, for the Holiday.  Later that afternoon, at about 4:47 p.m., Mr. Maurer emailed the Government informing them that witness David Burnett wanted to testify but was unable to attend Court the week after Thanksgiving.  Though Mr. Maurer inquired into setting a deposition for November 23, 2016 at 3:00 p m., all the assigned Government attorneys were unavailable.

Based on this unavailability, Mr. Maurer filed a motion for an order authorizing deposition for use at trial, "nunc pro tunc."  Without action on this motion from the Court, as is required by Fed. R. Crim. P. 15, Mr. Maurer conducted an *ex parte* deposition of Mr. Burnett on November 23, 2016.  On November 26, 2016, Mr. Maurer filed the deposition as a supplement to his motion.  When the trial resumed on November 28, 2016, Mr. Maurer stated that, although he had tried to contact Mr. Burnett at some point during the summer before trial, he had received no communication back until the previous week.  The Court denied Mr. Maurer's motion to authorize the use of David Burnett's deposition at trial, solely blaming Mr. Burnett for his absence at trial.  Additionally, the Court stated that because Mr. Maurer and Petitioner had presented testimony from Petitioner's other previous patients, Mr. Burnett's testimony would be cumulative, and the absence of such would not prejudice Petitioner.

THE COURT: Is there any dissatisfaction on your part with anything that he's done in this case up to this point in time?

THE DEFENDANT: No, there isn't.

THE COURT: Has anyone threatened you or promised you anything to answer the questions in the manner in which you've just answered them?

THE DEFENDANT: No.

THE COURT: And you have done so voluntarily and of your own free will?

THE DEFENDANT: Yes.

THE COURT: All right.  I'm satisfied.

Trial Tr., Gov't Exhibit One (hereinafter "Trial Tr."), ECF No. 382, 76:24-25; 77:1-22.

### 5.  Petitioner's Motion for Judgment of Acquittal

At the close of the Government's case-in-chief, Mr. Maurer orally moved for judgment of acquittal on Count three (3) (the "death results" count) and informed the Court that he was filing a written motion that same day.  In his written motion, Petitioner argued that the evidence was insufficient to allow a reasonable juror to find that the opioids found in Mr. Armstrong's system at the time of his death had been obtained pursuant to Petitioner's prescriptions.  Petitioner further argued that the evidence surrounding the drug-related counts failed to prove beyond a reasonable doubt that Petitioner issued the prescriptions in the Indictment outside the usual course of medical practice.

In a hearing on November 22, 2016, before the defense had rested, the Government responded that there were multiple pieces of circumstantial evidence that would allow a rational juror to find that the opioids in Mr. Armstrong's system at the time of his death were those prescribed by Petitioner.  Such evidence included: the date of the prescription, the quantity of pills prescribed, and testimony that Petitioner prescribed enough pills for personal use and to sell.

The Government concluded that such evidence was sufficient to allow all counts to be submitted to a jury. Ultimately, the Court agreed with the Government. One December 9, 2016 the jury found Petitioner guilty of 309 of the 322-counts, including Count three (3) relating to Mr. Armstrong's death. *See* Jury Verdict Form, ECF No. 274.

### B. Petitioner's Motion for New Trial as to the Death Result Count

On December 21, 2016, Petitioner filed a Motion for New Trial on Count three (3) of the Superseding Indictment. Mot. for New Trial, ECF No. 283. Petitioner argued that no reasonable juror could have found him responsible for the death of Mr. Armstrong because the Government failed to prove the origins of the opioids in his system. Specifically, Petitioner stated that "[n]o pill bottle was introduced into evidence in the Government's case in chief, and no witness described seeing Armstrong remove pills from a bottle corresponding to a prescription written by [Petitioner's] office[.]" *Id*. at 3.

The Court denied Petitioner's Motion, reiterating that Petitioner "thoroughly examined the perceived deficiencies in the government's evidence through cross-examination of witnesses and presentation of opening statements and closing arguments[.]" Mem. Op. Den. Mot. for New Trial, ECF No. 303, 5. Because both of the Government's expert witnesses concluded that Mr. Armstrong's death was caused by his ingestion of oxycodone and methadone, the Court found no basis to disturb the jury's credibility determination. *Id*. at 6-9.

### C. Sentencing and Post-Sentencing Procedural History

After denying his Motion for New Trial, on June 14, 2017, the Court sentenced Petitioner to a total of 300 months' imprisonment. *See* J., ECF No. 314. The Court also imposed a three (3)-year period of supervised release, a $50,000 fine, $30,700 in special assessments, and

$926.75 in restitution.  *Id*.  The Court then filed an amended judgment on June 23, 2017.  *See*

Am. J., ECF No. 318.

Petitioner filed a timely notice of appeal on June 28, 2017 (ECF No. 322), but the Third

Circuit denied the appeal on March 25, 2019 (ECF No. 367).  After withdrawing his first Motion

for Writ of Habeas Corpus, on March 11, 2019, Petitioner filed the present *pro se* § 2255 habeas

petition.  ECF No. 373.  The Government filed a response in opposition on November 13, 2020

(ECF No. 381), and Petitioner submitted a reply in support of his Motion on December 16, 2020

(ECF No. 386).  Petitioner's Motion is thus ripe for this Court's review.

### III.   Standard of Review

A motion to vacate, set aside, and/or correct a sentence under 28 U.S.C. § 2255 may be

granted when "the sentence was imposed in violation of the Constitution or laws of the United

States, or that the court was without jurisdiction to impose such sentence, or that the sentence

was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"

28 U.S.C. § 2255(a).

When assessing a *pro se* § 2255 petition, the petition itself and any supporting

submissions must be construed liberally and with a measure of tolerance.  *Lewis v. Attorney*

*General*, 878 F.2d 714, 721-22 (3d Cir. 1989).

The Court must grant an evidentiary hearing if the records in the case are "inconclusive

on the issue of whether [the] movant is entitled to relief."  *United States v. McCoy*, 410 F.3d 124,

131 (3d Cir. 2005) (quoting *Solis v. United States*, 252 F.3d 289, 294-95 (3d Cir. 2001)).  "The

standard governing...requests [for evidentiary hearings] establishes a reasonably low threshold

for habeas petitioners to meet."  *Id*.  (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir.

2001)).  A § 2255 petition "can be dismissed without a hearing [only] if (1) the petitioner's

allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *McCoy*, 410 F.3d at 134 (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)).

District Courts have discretion to conduct evidentiary hearings for § 2255 claims, but this discretion is not unrestrained. *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008), holding modified by *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841 (3d Cir. 2017). "The District Court is required to hold an evidentiary hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *United States v. Booth*, 432 F.3d 542 (3d Cir. 2005)). When considering a § 2255 motion, the Court "must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). Frivolous allegations are not entitled to an evidentiary hearing. *See Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987) ("Bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing."). The District Court may dispose of vague and conclusory allegations made in a § 2255 motion without investigating such claims any further. *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000). However, where the movant alleges sufficient supporting facts for a claim, the District Court should proceed in its consideration of their merit. *Id.* Nevertheless, the District Court may still find that such claims, while alleging specific facts, are frivolous. *Id.* at 438.

## IV.     Discussion

### A.     Statute of Limitations

To bring a successful § 2255 petition, Petitioner must first show his claim is timely.  A § 2255 petition must be filed within one (1) year from the latest of:

(1)     the date on which the judgment of conviction becomes final;

(2)     the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3)     the date on which the right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)     the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2255(f)(1)-(4).  "Finality attaches when [the] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."  *Clay v. United States*, 537 U.S. 522, 527 (2003).

Here, Petitioner filed the present Motion within one (1) year of the Third Circuit's denial of his appeal.  Neither the Government nor this Court dispute the timelines of the Petition, so the Court has jurisdiction to consider the merits of Petitioner's claims.

### B.     Ineffective Assistance of Counsel Claims

The Sixth Amendment right to counsel "is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  To prove that counsel was ineffective, Petitioner must establish that: (1) counsel's performance was constitutionally deficient; and (2) that deficiency prejudiced Petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance "requires showing that counsel made errors so serious that he or she was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment."  *Id.*

In essence, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. *Id.* at 688. He must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 690 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice requires showing that counsel's errors were serious enough to deprive the defendant of a fair trial. *Id.* at 687. "The defendant must show that there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Petitioner's § 2255 Motion is disjointed in that, although he references an "attachment A," to explain his claims for ineffective assistance of counsel, "attachment A" is a one-page email that fails to discuss the facts of Petitioner's case or Mr. Maurer's alleged effectiveness.[2] However, on the same day Petitioner filed the present Motion, he also filed a Motion for Appointment of Counsel (ECF No. 374) which lists, amongst others, three (3) primary claims for ineffective assistance of counsel. Petitioner specifically states,

> In this Declaration I am going to focus on the primary issues, but there are other issues. The issues I believe are salient are:
>
> (1) The lack of an expert to dispute Dr. Stephen Thomas's testimony as an expert in the field of pain management.
>
> (2) The failure to cross examine Melissa Orler on who's (sic) actual pills Joseph Armstrong consumed between February 12 and February 17, 2011, leading up to his death.

---

[2] The "attachment A" email is an email sent from an individual named Rita Gaupp to an unidentified, numerical address (71927066). The email appears to discuss an unidentified article about how doctors, who are dealing with opioid addicts, should work to bridge prescriptions to avoid the dangers of withdrawal. While this may be true, a conclusion the Court cannot and will not presume, the Court finds the contents of the email inapplicable to the case at hand where many of Petitioner's patients reported having no opioids in their system *prior* to them becoming his patient. Petitioner fails to provide any further argument regarding the relevance of this email, so the Court will not consider its content further for purposes of the present Motion.

(3) The decision to use me as an Expert Witness while fully knowing that the Government had discredited my credibility.

Mot. for Appointment of Counsel 4.  In addition to these primary claims, Petitioner mentions secondary complaints in multiple paragraphs of his Motion.  Liberally construing these arguments as the basis for his ineffective assistance of counsel claims, the Court will address each in turn.

### 1.  Claim One: Counsel's Failure to Present an Expert to Dispute Dr. Thomas's Expert Testimony

Petitioner first argues Mr. Maurer was ineffective for failing to present an expert to dispute Dr. Thomas's testimony.  *Id*.  The Government responds that such a statement is undeniably false given that Petitioner, himself, was deemed an expert witness and rebutted Dr. Thomas's opinion surrounding the case, generally, and his expertise in pain management.  Gov't Response in Opposition 27-28.  Having reviewed the filings, the Court agrees with the Government.

"An evaluation of the failure on the part of defense counsel to call witnesses falls squarely within the first prong of *Strickland*, which pertains to whether the attorney made his tactical decisions 'in the exercise of reasonably professional judgment.'"  *Bowen v. Blaine*, 243 F. Supp. 2d 296, 311 (E.D. Pa. 2003) (quoting *Strickland*, 466 U.S. at 690).  With "professional reasonableness as a touchstone, '[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him.'"  *Bowen*, 243 F. Supp. 2d at 311 (quoting *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990).  Rather, a petitioner must show a "reasonable likelihood...that information [not presented] would have dictated a different trial strategy or led to a different result at trial."  *Lewis v. Mazurkiewicz*, 915 F.2d 106, 115 (3d Cir. 1990).

Petitioner fails to show how the presentation of a different expert witness would have "led to a different result at trial." *Id.* The record makes clear that Mr. Maurer called Petitioner as an expert witness in pain management for the express purpose of disputing the testimony of Dr. Thomas. During his testimony, Petitioner repeatedly criticized Dr. Thomas for expressing an opinion about Petitioner's medical treatment when Dr. Thomas failed to interview his patients.[3]

Not only did Petitioner dispute Dr. Thomas's opinion in his testimony, but Petitioner was apparently satisfied with the amount of witnesses called at the time of the trial. At the end of the defense's case, when asked if there were any further witnesses Petitioner wanted called, he stated, "I'm satisfied at this point, Your Honor." Trial Tr. 77:2-3. Though Petitioner is clearly upset with the jury's view of his own testimony, such discontent is an insufficient justification for ineffective assistance of counsel. As the Supreme Court makes clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669. Neither during the trial colloquy nor in the present Motion does Petitioner mention that Mr. Maurer failed to adequately prepare him for his testimony. Petitioner's "hindsight" cannot establish prejudice to find Mr. Maurer ineffective.

Any claim that Mr. Maurer was ineffective for failing to provide an expert to rebut the testimony of Dr. Thomas is not only false but cannot amount to ineffective assistance of counsel.

---

[3] For example, Petitioner stated that Dr. Thomas, "Never examined the patient. Never interviewed him. He's making categorical statements and - - and in - - in his own testimony and in your own words, how can you judge the patient if you don't examine them and interview them? So on one hand, it's acceptable to be very critical and.. make a judgment, an expert judgment, never interviewing or never examining a patient, but on the other hand, that must be done for there to be medicine occurring." App. 1333:3-10.

### 2. Claim Two: Counsel's Failure to Cross-Examine Melissa Orler about the Source of the Pills that Led to Mr. Armstrong's Death

Petitioner's second primary claim alleges that Mr. Maurer failed to cross-examine Ms. Orler about the source of the pills Mr. Armstrong used prior to his death.  Mot. to Appoint Counsel 4.  The Government responds that such claim clearly ignores the factual record because Mr. Maurer did cross-examine Ms. Orler about this exact point.  Gov't Response in Opposition 28.  Having reviewed the trial transcript, the Court finds Petitioner's claim categorically false.

The trial record in this case clearly shows that Mr. Maurer asked Ms. Orler if her husband had any other source, besides Petitioner, from whom he received opioids.  Specifically, Mr. Maurer asked, "[o]ccasionally your husband [Joseph Armstrong] would run out of the oxycodone that he had been prescribed [by Petitioner]?"  App. 799:7-8.  Ms. Orler responded, "[n]inety percent of the time, no."  App. 799:9.  Mr. Maurer followed up by asking, "you knew there were times that he went to the street to buy oxycodone as well," to which Mr. Orler replied "[n]ever."  App. 799:12-14.  Mr. Maurer immediately asked again, "Never?"  App. 799:15.  Ms. Orler stated, "[n]ever, not once.  I'm not going to lie."  App. 799:16.

These questions explicitly relate to the source of Mr. Armstrong's opioids.  Though the testimony did not result in the answers Petitioner may have desired, such failure cannot be attributed to Mr. Maurer's advocacy skills.  Had there been further evidence that Mr. Armstrong acquired opioids from a source other than Petitioner, it is possible Mr. Maurer could have impeached Ms. Orler on this point.  However, both the trial transcript and Petitioner's Motion fail to cite or present such evidence, likely because it does not exist.  Though the jury verdict suggests that Mr. Maurer failed to discredit Ms. Orler's testimony, the Court finds no evidence that such failure was due to a lack of advocacy efforts.  Rather, Mr. Maurer was facing difficult

evidence to overcome, and, without more, this Court will not usurp the jury's credibility determination years after the fact.

Petitioner's claim that Mr. Maurer failed to cross-examine Ms. Orler about the source of her husband's opioids is not only contradicted by the trial record but also is insufficient to warrant a claim of ineffective assistance of counsel.

### 3. Claim Three: Counsel's Use of Petitioner as an Expert Witness when the Government Discredited his Credibility

As his final primary claim, Petitioner alleges Mr. Maurer was ineffective for using Petitioner as an expert witness "while fully knowing that the Government had discredited [his] credibility." Mot. to Appoint Counsel 4. He states, "I believe the worst mistake made by Mr. Maurer was believing that the jury would take me creditably after the Government's destruction of my reputation." *Id*. at 13. The Government rebuts Petitioner's claim by stating that, if anything, Petitioner had the benefit of providing his opinion testimony as to the treatment of his patients, and, even if using Petitioner as an expert witness did not result in the desired outcome at trial, Petitioner cannot rely on the benefit of hindsight to make an ineffective assistance of counsel claim. Gov't Response in Opposition 29-30. The Court finds the same.

As the Government states, "[t]he ability to offer opinion testimony gave [Petitioner] a strategic advantage that few criminal defendants enjoy. In particular, [Petitioner] could address Dr. Thomas's expert opinion by offering factual statements about his treatment of patients and opinion testimony that supported his treatment." *Id*. at 29. Submitting Petitioner as an expert witness was a strategic choice Mr. Maurer made, allowing Petitioner to provide his own expert opinion regarding Dr. Thomas's testimony.

Though Petitioner appears to argue that the Government damaged his credibility through both other testimony and cross-examination, the same can be said of any other expert witness

that Mr. Maurer could have called to testify.  Petitioner cannot now state a claim of ineffective assistance simply because a trial strategy ended up being unsuccessful.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. 689 (quoting *Michel*, 35 U.S. at 101).

Not only can hindsight not now benefit Petitioner, but also, as previously stated, Petitioner admitted his satisfaction with the witnesses called at trial at the close of the defense's case.  *See* Trial Tr. 77:2-3.  Petitioner's failure to question the effectiveness of his own expert testimony at the time of trial lends this Court to attribute his current discontent to the benefit of hindsight.  Accordingly, Mr. Maurer calling Petitioner as an expert witness cannot and does not amount to ineffective assistance.

### 4.   Claim Four: Counsel's Failure to be Experienced in this Area of Law

While the three (3) previously mentioned arguments are, as Petitioner characterizes, his primary claims for ineffective assistance of counsel, throughout his Motion for Appointment of Counsel, Petitioner lists several, ancillary issues.  The Court will address each of those in turn.

In paragraph two (2) of his Motion, Petitioner states that Mr. Maurer was deficient because he had never worked on a case like his before.  Mot. for Appointment of Counsel 1. However, Petitioner has failed to state, and this Court has failed to find, any precedent or statute that requires counsel to have experience in this type of case.[4]  Even if such precedent did exist, it is indisputable that Mr. Maurer has decades of legal experience, and, as CJA counsel, his

---

[4] Though there exists precedent stating that an attorney with no capital trial experience could still create a "sound and reasonable" trial strategy by consulting with or receiving experience from a more experienced attorney, such precedent is distinguishable from a typical, criminal matter, where there is no bifurcated trial and the verdict cannot result in death.  *See Mitchell v. Meko*, No. 08-511, 2012 WL 176583, at *3 (E.D. Ky. Jan. 12, 2012).

credentials have been verified by this Court. Beyond the Court's recognition of his abilities, the Court has presently cited to multiple instances of Mr. Maurer's advocacy skills before, during, and after trial. The record amply demonstrates that Mr. Maurer effectively attacked the factual and legal foundations of the Government's case, even if he did not have a substantial background in drug-related cases.

Not only does the Court deny that Mr. Maurer offered ineffective assistance, but apparently Petitioner also felt this way at the time of his trial. Specifically, the following exchange occurred during Petitioner's trial colloquy:

> THE COURT: Are you satisfied [with] the representation your counsel, Mr. Maurer, has provided you up to this point in time?
>
> THE DEFENDANT: Yes, I am.
>
> THE COURT: Is there any dissatisfaction on your part with anything that he's done in this case up to this point in time?
>
> THE DEFENDANT: No, there isn't.

Trial Tr. 77:7-14. Petitioner had ample opportunity to speak on the record about Mr. Maurer's alleged deficient performance, but he failed to do so. Because the present record so clearly contradicts Petitioner's claims, even assuming Mr. Maurer did not have a lot of trial experience with drug-related charges, the Court finds Mr. Maurer was sufficiently experienced to be a zealous advocate.

### 5. Claim Five: Counsel's Personal and Marital Issues

Having determined that Mr. Maurer was an effective advocate, the Court will briefly address Petitioner's allegations that Mr. Maurer was having marital problems and sleeping in his car at the time of trial. Mot. for Appointment of Counsel 1. Even if Petitioner's allegation is true, a statement this Court cannot affirm or deny, Petitioner fails to cite, and this Court has

failed to find, any instance where Mr. Maurer was unprepared for legal or factual issues due to complications in his personal life.  Without more, Petitioner's allegations surrounding Mr. Maurer's personal life do not amount to ineffective assistance of counsel.

### 6.   Claim Six: Counsel's Failure to Call Desired Witnesses and Explain Why

In his third paragraph, Petitioner appears to claim Mr. Maurer was ineffective for failing to call a list of witnesses who were prescribed the exact same dose or more than Mr. Armstrong. Mot. for Appointment of Counsel 1.  Petitioner claims that Mr. Maurer did not call these witnesses because he "believed that the jury could not render a verdict against [Petitioner] based upon the evidence he had submitted." *Id*.  Though Petitioner, understandably, would have desired to call such witnesses now, such hindsight cannot be applied to gauge the effectiveness of Mr. Mauer.  This is especially true where, at the time of trial, Petitioner responded, "I'm satisfied at this point, Your Honor" when asked if there was any other testimony he wished to have presented.  Trial Tr. 76:24-25; 77:1-3.  Now that Petitioner realizes the jury verdict, he cannot change his satisfaction with the witnesses presented at trial.

As previously stated, when considering the prejudice prong of *Strickland*, a petitioner must show a "reasonable likelihood...that information [not presented] would have dictated a different trial strategy or led to a different result at trial." *Lewis*, 915 F.2d at 115.  Though Petitioner states that these individuals were prescribed equal or higher doses of opioids than Mr. Armstrong, Petitioner fails to state why the admission of such testimony would have "led to a different result at trial." *Id*.  Without such explanation, the Court cannot find that Petitioner was prejudiced without this testimony.

In addition to wanting additional witnesses to testify, Petitioner also states that Mr. Maurer failed to explain why the deposition of a desired witness, David Burnett, was not

admitted into evidence.  The Government states that such explanation was not necessary when

Petitioner was present with Mr. Maurer at trial when the Court orally addressed the deposition

testimony.  Gov't Response in Opposition 31.  The Court agrees with the Government that the

Court fully explained the exclusion of Mr. Burnett's testimony while Petitioner was present.  If

Petitioner had any further questions about the exclusion of the testimony, Petitioner had ample

opportunity to ask either Mr. Maurer or this Court.  Such claims fail to amount to ineffective

assistance.

### 7.  Claim Seven: Counsel's Failure to Properly Cross-Examine Dr. Lieberman

In paragraph five (5) of his Motion to Appoint Counsel, Petitioner asserts that Mr.

Maurer was ineffective for failing to properly cross-examine one of the Government's witnesses,

Dr. Lieberman.[5]  Specifically, Petitioner desired to have Mr. Maurer cross examine Dr.

Lieberman about his credentials and whether he was board certified.  Mot. to Appoint Counsel 2.

Despite Petitioner's claims to the contrary, the record is clear that Mr. Maurer specially asked,

"you weren't a board certified forensic pathologist," to which Dr. Lieberman responded "[t]hat is

correct."  App. 820:13-14.  With the factual record so clearly contrary to Petitioner's present

claim, the Court will not consider this point any further.

### 8.  Claim Eight: Counsel's Failure to Present a Proper Defense

In paragraph six (6) of his Motion for Appointment of Counsel, Petitioner states that Mr.

Maurer "failed to properly present [his] defense."  Petitioner offers no further explanation as to

---

[5] Though, in paragraph four (4), Petitioner claims Dr. Lieberman stated that but for Mr. Armstrong's use of oxycodone and methadone, Mr. Armstrong would have lived, it is unclear how this relates to any claim for ineffective assistance of counsel.  Mot. to Appoint Counsel 1-2.  In almost any case, testimony will be brought out at trial that is harmful to the opposing side.  If voicing such testimony, alone, constituted ineffective assistance, no trial verdict would ever be final.  Without further explanation, the Court will not consider such argument for purposes of this Motion.

this point, so the Court will interpret this to mean that he was not satisfied with Mr. Maurer's performance.  As previously stated, however, it appears Petitioner's discontent with Mr. Maurer's advocacy skills arose after the jury found Petitioner guilty.  Such hindsight cannot be considered in determining the effectiveness of counsel, particularly where Petitioner affirmed his satisfaction with Mr. Maurer's performance at the trial.  Though the Court recognizes Petitioner's dissatisfaction with his guilty verdict, without further explanation, such unhappiness cannot be attributed to Mr. Maurer's advocacy efforts.

### 9.  Claim Nine: Counsel's Failure to Investigate or Call Crucial Witnesses

In paragraph seven (7), Petitioner claims that "Mr. Maurer's lack of investigations and presentation of crucial witnesses[6] left the jury with no alternative to a guilty verdict."  Mot. for Appointment of Counsel 2.  Petitioner further states that, after the trial, Mr. Maurer came to his holding cell and stated that Petitioner could file a claim for ineffective assistance of counsel.  *Id*. The Court finds it unpersuasive to argue that Mr. Maurer was admitting his own ineffectiveness by telling Petitioner that he could file a claim for ineffective assistance, when, likely, Mr. Maurer was sharing alternative routes of post-trial review.  If anything, such legal advice is evidence of Mr. Maurer's trial experience and advocacy skills.

Even with such advice, however, Petitioner fails to explain how Mr. Maurer did not thoroughly investigate his case.  Petitioner does not state any evidence, newly discovered or not, that Mr. Maurer failed to discover that would, ultimately, have led to a different verdict.  Without such evidence, the Court fails to find that Mr. Maurer's investigation was inadequate.

---

[6] The Court has repeatedly explained that Petitioner affirmed Mr. Maurer's presentation of witnesses at trial.  This Court will not consider further allegations relating to the presentation of witnesses for purposes of ineffective assistance.

### 10. Claim Ten: Counsel's Failure to Take a Deposition of Dr. Thomas

In paragraph eleven (11), Petitioner states that Mr. Maurer failed to take a deposition from one of the Government's expert witnesses, Dr. Thomas.  Mot. for Appointment of Counsel 5-6.  Petitioner states that such deposition would have revealed that Dr. Thomas routinely testifies on behalf of the Government.  *Id*.  The Government does not dispute that Mr. Maurer did not take a deposition of Dr. Thomas but states that such failure was not out of the ordinary as "criminal cases rarely use pre-trial depositions."  Gov't Response in Opposition 32.  It is unnecessary for this Court to determine whether Mr. Maurer should have taken Dr. Thomas's deposition because the fact that Dr. Thomas routinely testifies on behalf of the Government, without more, is insufficient to suggest Petitioner's verdict would have been different.

It is indisputable that there was far more evidence and testimony than just Dr. Thomas's that led to Petitioner's conviction.  Though cross-examining Dr. Thomas about his testimony history could have weakened his credibility, the Court finds it unpersuasive to say that such testimony, alone, would have changed the result of Petitioner's trial.  Accordingly, the Court finds Mr. Maurer's failure to take a pre-trial deposition of Dr. Thomas insufficient to warrant ineffective assistance of counsel.

### 11. Claim Eleven: Counsel's Failure to Ask Ms. Orler if she and Mr. Armstrong Shared his Prescriptions

In paragraph sixteen (16), Petitioner states that Mr. Maurer failed to ask Ms. Orler if she and Mr. Armstrong shared the prescriptions Petitioner prescribed to Mr. Armstrong.  Mot. for Appointment of Counsel 12.  Such statement is clearly contracted when Mr. Maurer asked, "[y]ou did on occasion steal his medicine," to which Ms. Orler responded "[n]ever."  App. 802:22-24.  In response to another question on cross-examination, Ms. Orler acknowledged that Mr. Armstrong kept his prescriptions in a lockbox because "[h]e always thought I was stealing

them, and I wasn't." App.802:18-19. Despite Petitioner's claims to the contrary, the record clearly shows that Mr. Maurer explored this area of potential weakness in Ms. Orler's testimony. The fact that Ms. Orler did not provide the responses Petitioner may have liked cannot be attributed to any failure by Mr. Maurer, and Petitioner's false allegations cannot be considered ineffective assistance.

### 12. Claim Twelve: Counsel's Failure to Inquire into Mr. Armstrong's Tolerance

In paragraph twenty (20), Petitioner claims that Mr. Maurer "never inquired that Mr. Armstrong's tolerance build up over 10 years would have required a stronger dosage than someone with a lesser tolerance buildup." Mot. for Appointment of Counsel 13. Even though Mr. Maurer never inquired about Mr. Armstrong's tolerance, Petitioner fails to explain, and the Court fails to see, how the lack of such testimony prejudiced Petitioner. The Government states, and the Court agrees, that two experts found oxycodone as being the "but for" cause of Mr. Armstrong's death. Gov't Response in Opposition 33-34. Though Mr. Armstrong's tolerance could help explain why Petitioner prescribed a particular dosage, it remains undisputed that Mr. Armstrong died because of the pills Petitioner prescribed.

Additionally, Petitioner was, himself, tendered as an expert in pain management. If Mr. Armstrong's tolerance was a necessary point for the jury to consider, a conclusion this Court will not presume, Petitioner had ample opportunity to make such a statement during his own testimony. The lack of such testimony cannot and will not be considered ineffective assistance.

Having considered all of Petitioner's claims, the Court fails to find one (1) legitimate instance of ineffective assistance of counsel. Accordingly, Petitioners § 2255 petition must be denied.

C.      **Certificate of Appealability**

When a District Court denies a § 2255 petition, a petitioner may not appeal such decision

to the Court of Appeals unless he has obtained a certificate of appealability.  28 U.S.C.  2253.

"A certificate of appealability may issue…only if the applicant has made a substantial showing

of the denial of a constitutional right."  28 U.S.C.A. § 2253(c)(2).  Petitioner must apply to the

District Court for such a certificate, pursuant to Local Appellate Rule 22.2.

The Third Circuit has denied requests for certificates of appealability where ineffective

assistance of counsel was alleged by a petitioner but proved to be a baseless claim.  *See Santana*

*v. United States*, 98 F.3d 752, 753 (3d Cir. 1996) ("Since [the petitioner] has not made a

substantial showing of the denial of a constitutional right [,despite his claims of ineffective

assistance of counsel,] we deny the request for a certificate of appealability).  The Supreme

Court had held that "where a district court has rejected the constitutional claims on the merits,

the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate

that reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  However, if the district

court denies a habeas petition on procedural grounds – without reaching the underlying

constitutional claim – a certificate of appealability should "issue when the prisoner shows, at

least, that jurists of reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right and that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling."  *Id.*

Here, the record is clear as to the baselessness of Petitioner's constitutional claims.  For

the reasons previously considered by this Court, Petitioner has not made the requisite showing

that a constitutional right is being denied, and no reasonable jurist would find that Petitioner's §

2255 petition was improperly denied.  Accordingly, Petitioner's request for a certificate of appealability is denied

**V.      Conclusion**

For the reasons set forth hereinabove, Petitioner's § 2255 is denied, and a certificate of appealability will not be issued.  An appropriate Order follows.


BY THE COURT:


*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II      J.